**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 17-CR-4071-LTS-1 |
| vs. | |
| | **REPORT AND** |
| | **RECOMMENDATION** |
| KELVIN LEE ROSS, | |
| Defendant. | |

_____

## *TABLE OF CONTENTS*

*I.     INTRODUCTION..................................................................... 1*

*II.    BACKGROUND........................................................................ 3*

*III.   DISCUSSION........................................................................... 8*

> *A.  Search of the Motel Room and Vehicle Under the Warrant and the Leon Good-Faith Exception ................................................................ 8*
> > *1.    Ross' Vehicle ............................................................. 12*
> > *2.    Room 33.................................................................... 15*
> *B.  Search of the Vehicle Under the Automobile Exception...................... 20*
> *C.  Failure to Read Ross His Rights Under Miranda ............................. 23*

*IV.   CONCLUSION ....................................................................... 26*

## I.     INTRODUCTION

The grand jury charged Defendant Kelvin Lee Ross in an indictment with conspiracy to distribute a controlled substance (along with codefendants William Hill and Shane Monell) and possession with intent to distribute a controlled substance (along with

codefendant Hill). Doc. 4. Ross filed an amended[1] motion to suppress (Doc. 29), which the Government resists (Doc. 25). I conducted a hearing on the motion on March 13, 2018. Docs. 31, 32. The Government presented testimony from Officer Heather Albrecht of the Sioux City Police Department, and formerly of the Drug Enforcement Administration's Tri-State Drug Task Force (Tri-State Drug Task Force) (the search warrant affiant and case agent in this case); Officer Paul Yaneff of the Sioux City Police Department; Resident Agent in Charge Brian Hunt, and Task Force Officers John Howard, Brenton Heald, and Eric Davis, all of the Tri-State Drug Task Force. Doc. 31. The following Government exhibits were also received by the Court:

Exhibit 1     motel registration card (Doc. 25-1);
Exhibit 2     search warrant, application, and affidavit (Doc. 25-2);
Exhibit 3     photograph—motel room #33 (Doc. 25-3); and
Exhibit 4     photograph—wider view of motel (Doc. 25-4).

Ross' attorney discussed Defendant's Exhibit 1 (Officer Yaneff's police report) during cross-examination of Officer Yaneff, but this exhibit was not offered into evidence. During the hearing, the parties made a request to delay their final oral arguments on the motion until the production of a transcript from the hearing had been completed. Doc. 31, 32. The transcript of hearing was filed on March 20, 2018 (Doc. 32), and I conducted a hearing on the final oral arguments on the motion on March 26, 2018. Doc. 35.

Ross seeks to suppress evidence seized during a search of a motel room and vehicle by arguing that the search warrant was not supported by probable cause and that the

---

[1] Ross' original motion to suppress was filed on January 16, 2018. Doc. 22. The Government filed a resistance on January 30, 2018. Doc. 25. On January 31, 2018, Defendant Ross filed a motion to continue the trial and extend the deadline to reply to the Government's response. Doc. 26. On February 1, 2018, the trial was continued to May 7, 2018, and Defendant Ross' deadline to reply to the Government's response was extended to March 1, 2018. Doc. 27. Ross filed the amended motion on March 1, 2018 (Doc. 29), to address the drug detection dog's sniff of the vehicle because counsel was not aware of any information or discovery about the dog sniff until after Ross filed the original motion to suppress. Doc. 29 at 1. That same day, Ross filed a reply to the Government's resistance that also acted as his brief in support of the amended motion. Doc. 30.

search warrant description for the vehicle was not sufficiently particular. Doc. 22-1 at 3-9; Doc. 30 at 4-10. Ross also seeks to suppress statements he made during the search of the motel room by asserting the statements were made in response to interrogation and in violation of Ross' rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Doc. 22-1 at 9-10; Doc. 30 at 10-12.

For the reasons explained below, I respectfully recommend that the Defendant's amended motion to suppress (Doc. 29) be **granted in part and denied in part**.

## II.    BACKGROUND[2]

On the morning of November 8, 2017, Officer Albrecht received information from a confidential informant about a drug deal involving Monell. The informant relayed that Monell had called, asking whether the informant wanted to buy methamphetamine. Monell had explained that a source from California had spent the night in Omaha and was on the way to Sioux City with five pounds of methamphetamine. Based on this information, officers set up surveillance of Monell's residence in Dakota City, Nebraska.

Monell called the informant and asked the informant to meet him at Monell's father's house in Sioux City, Iowa, and officers followed Monell there. Around 2:18 p.m., a gray Kia with California license plates arrived at Monell's father's house. The driver of the Kia (later identified as Hill) went into the residence for a few minutes. Around the same time, the informant advised officers that Monell had said, "it's on," "come over," and "[his] California guy was here and staying at a hotel waiting for money." Around 2:25 p.m., Monell and Hill exited the house. Monell left in his vehicle, and Hill went back into the house. Some officers remained at Monell's father's house, while others followed Monell.

_____

[2] The relevant facts contained in this section came from the affidavit submitted in support of the search warrant (Doc. 25-2 at 5-7) and testimony presented during the suppression hearing.

Officers arrested Monell for traffic violations and took him into custody. Monell told officers that he had previously purchased 1¼ pounds of methamphetamine from Hill (who he referred to as Will) and that Hill had come to town to deliver five pounds of methamphetamine. Monell also said "his guys" and "they" were coming with methamphetamine, implying that more people were involved than just Hill.[3] Monell said that he had not yet seen the drugs, but he believed they were in Hill's car parked at his father's residence. While officers (including Officer Davis) interviewed Monell, Officer Albrecht prepared a search warrant application for the gray Kia that Hill had driven to Monell's father's house and that was still parked there. During this time, Officer Albrecht heard Monell's phone ring several times, and she also saw text messages appear on the phone's lock screen from a contact named "Kelsey Monell," informing Monell that his "packages" had arrived and asking when he would return. Officer Albrecht obtained a search warrant for the gray Kia driven by Hill, which was eventually searched at the police station because it was starting to get dark, but officers did not find a "large amount" of methamphetamine.

At some point while Officer Albrecht was appearing before a judge to obtain a search warrant for the gray Kia, Hill exited Monell's father's house, which was still under surveillance, and he was arrested. Officers recovered two cell phones: an iPhone on Hill's person and a flip phone that he had thrown under his vehicle when he saw officers approaching. A few hours after officers had obtained the phones, Agent Hunt observed text messages from a California area code popping up on the iPhone's lock screen, which read, "Where you at, cuzo?"; asked why Hill was not answering his phone;

---

[3] The affidavit does not include that Monell used the term "his guys"; it states that during Monell's interview, Monell said when he called Hill and asked where he was, Hill said "he [wa]s on his way and 'they' are coming soon after him to deliver the meth[amphetamine]." Doc. 25-2 at 6.

directed Hill to find "us" another hotel; and stated that if Hill did not respond, "we" are hitting the road.[4]

Officer Albrecht searched the phone number sending text messages to Hill's phone on Facebook and discovered that the phone number was linked to Ross' Facebook account (which included a picture of Ross). Officers (including Officer Howard) began searching hotels in the area for vehicles with California license plates and running the license plates in the system to see if any belonged to Ross. Officer Howard found a rental vehicle with California plates, a minivan at a Holiday Inn, but Ross was not registered at the hotel, and officers moved on. Around 8:00 p.m., officers eventually discovered a dark blue Kia with California plates registered to Ross parked at the Town and Country Motel, which was located "within a mile" of Monell's father's house. The vehicle registration listed an address for Ross in Palm Springs, California. Although Ross was not registered at the motel, motel employees informed officers that a woman named Karina Watts from Carson, California, had rented room 33 and listed a Kia with California plates on her motel registration card. Doc. 25-1; Doc. 32 at 17. The license plate number of the Kia registered to room 33, however, differed from Ross' vehicle and the vehicle driven by Hill. Doc. 25-1; Doc. 25-2 at 6; Doc. 32 at 17, 19. Ross' vehicle was parked directly in front of room 33, and no other vehicles were parked nearby. Officers conducting surveillance kept eyes on the vehicle registered to Ross from the time it was discovered until it was eventually searched, and it remained parked in front of room 33 the entire time. Officer Howard assisted in surveillance of the vehicle when it was first discovered, and at one point, he observed a person he believed to be Ross walk from near Ross' vehicle to the restaurant parking lot where Officer Howard and his partner were parked.

---

[4] Agent Hunt testified that based on those text messages, he believed there was a "follow car" in Sioux City that they had not previously been aware of and that Ross had come with Hill to Sioux City to distribute methamphetamine. Doc. 32 at 39. As a result, he directed officers to begin looking for another vehicle from California. No additional testimony was elicited about the meaning or significance of a "follow car."

5

Officer Howard and his partner then left because Ross appeared to be looking at them in concern (and other officers had arrived to continue surveillance).

Officer Albrecht prepared a search warrant, application, and affidavit, seeking to search Ross' vehicle and room at the motel (room 33). The affidavit set forth some of the information about Monell obtained from the confidential informant and the information about Hill gathered during the interview with Monell, as well as the officers' observations while surveilling Monell's father's house. Doc. 25-2 at 6. The affidavit included the text messages officers had observed on Monell's and Hill's phones (and linked the text messages to Hill as being from Ross). *Id.* The affidavit also described the officers discovering a vehicle registered to Ross at the Town and Country Motel. Doc. 25-2 at 6-7. The only information about room 33 was that "owners indicated that room 33 is rented to [Watts] of Carson, [California,] and listed [Ross'] vehicle on the hotel" registration card. *Id.*[5] Finally, the affidavit included belief statements:

> From my experience as a police officer, and through conversations with other law enforcement officers, . . . . I am . . . aware that drug dealers will use vehicles as safe houses to hide their illegal drugs and to transport illegal drugs from one point to another. . . . I am also aware that drug dealers often use electronic pagers and cellular telephones as tools in illegal drug trafficking. . . . Based on my training and experience I know it is not uncommon for large drug dealers to show up at a buy location without any drugs. I know large drug dealers want to see the money before showing the drugs to the buyer and they will keep the shipment of methamphetamine close for quick retrieval.

Doc. 25-2 at 5, 7. The affidavit did not state that the vehicle Hill drove to Monell's father's residence had been searched earlier in the day. Neither did the affidavit include the text message from Ross asking Hill to find a different hotel for them.

---

[5] The affidavit says that the "hotel reservation" for room 33 listed Ross' vehicle. Doc. 25-2 at 6-7. From the testimony at the hearing, this portion of the affidavit seems to be referring to the information from the hotel registration card (Doc. 32 at 17), which, as discussed, only "listed" Ross' vehicle in the sense that it listed a Kia with California plates (like Ross' vehicle), but one with a different license plate number than Ross' vehicle.

The search warrant and application described the car accurately except for a typo spelling Kia: they described the vehicle as a "2016 Kai 4 door," listed the correct vehicle identification number (VIN number), and stated the vehicle was registered to Ross. Doc. 25-2 at 1-4. The affidavit attached to the search warrant application, however, listed the wrong license plate number for the vehicle but otherwise described it accurately as "a dark blue Kia 4 door with California plates . . . registered to [Ross]." Doc. 25-2 at 6.[6] Officer Albrecht testified that she inadvertently used the license plate number of the rental minivan parked at the Holiday Inn because she had multiple license plate numbers written down in her notes.

After officers obtained the search warrant for room 33 and for the Kia registered to Ross, officers first secured the people inside room 33: Ross, Watts, and another woman, Neiya Poellnitz. Ross was lying on the bed when officers entered the room. Later, while the room was being searched and Ross was handcuffed, Officer Davis spoke to Ross, asking him where he was from (California), where they had been traveling to, and what they had been doing. Officer Davis also asked whether a tattoo on Ross' arm that said "KC" stood for Kansas City. Ross reportedly responded with a smirk that it stood for Los Angeles Crips. No officer read Ross his *Miranda* warnings prior to this conversation.

Before officers searched Ross' car as authorized by the search warrant, Officer Yaneff, a K-9 officer, conducted a drug detection dog sniff of the vehicle with his K-9 Cash. Cash gave a positive alert for drugs on the driver's side of the vehicle near the

---

[6] The affidavit also mentions a "gray 2016 Kia 4 door with California plates" parked at Monell's father's residence—the vehicle Hill had driven that had already been searched earlier in the day (although this fact is not mentioned in the affidavit). Doc. 25-2 at 6. The affidavit concludes by requesting to search "the 2016 Kia," which could refer to Ross's vehicle or the vehicle driven by Hill. Doc. 25-2 at 7. Any confusion was resolved by the search warrant and application describing the vehicle to be searched as the one registered to Ross.

driver's-side door and quarter panel.[7]  When officers searched the Kia registered to Ross, they discovered two pounds of methamphetamine under the hood on the driver's side.

Ross argues that the search warrant and facts known to the officers did not sufficiently connect him to the drug deal involving Hill and Monell and that therefore, officers did not have probable cause to search his motel room and vehicle.  He also relies on the typo in the warrant and the search warrant affidavit listing the wrong license plate number for his vehicle.  In addition, he argues that his statement about his tattoo was obtained in violation of his *Miranda* rights.

## III.  DISCUSSION

### A.  Search of the Motel Room and Vehicle Under the Warrant and the <u>Leon</u> Good-Faith Exception

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no [w]arrants shall issue, but upon probable cause . . . particularly describing the place to be searched."  U.S. Const. amend. IV.  In accordance with "[t]he Fourth Amendment's strong preference for searches conducted pursuant to a warrant," "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review"; "the duty of a reviewing court is simply to ensure that the [issuing judge] had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 236, 238-39 (1983) (last alteration in original) (quoting

---

[7] Officer Yaneff admitted that in his police report of the drug dog sniff, he documented that the sniff was conducted on a vehicle registered to Poellnitz (not Ross), and he listed the wrong license plate and VIN numbers for the vehicle.  He explained that earlier in the day, he had conducted a drug dog sniff of the Kia parked at Monell's father's house (the vehicle Hill had been driving) and that he accidentally listed this vehicle's information in his report instead of the correct information.  I credit his testimony that a sniff was done of Ross' vehicle "parked in front of the door of the [motel room] that [officers] were executing the search warrant on . . . . [a]t the Town and Country Motel," Doc. 32 at 67, despite the wrong information contained in his report.

8

*Jones v. United States*, 362 U.S. 257, 271 (1960)); *accord United States v. Buchanan*, 574 F.3d 554, 561 (8th Cir. 2009). "When the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (alteration in original) (quoting *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999)).

Probable cause exists when, "under the totality of circumstances, there is a fair probability [that] evidence of a crime will be found in a particular place" or that the requested search will "lead to the discovery of evidence." *United States v. Faulkner*, 826 F.3d 1139, 1144, 1146 (8th Cir. 2016). "Not only may an issuing judge 'draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant, [the Eighth Circuit] has also recognized that law enforcement officers may make reasonable inferences in preparing affidavits in support of a warrant.'" *United States v. Brackett*, 846 F.3d 987, 992 (8th Cir. 2017) (quoting *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000)). Probable cause requires a nexus between the items officers are searching for and the place or item to be searched. *United States v. Johnson*, 848 F.3d 872, 878 (8th Cir. 2017). "Factors to consider in determining if a nexus exists include 'the nature of the crime and the reasonable, logical likelihood of finding useful evidence.'" *Id.* (quoting *United States v. Colbert*, 828 F.3d 718, 726 (8th Cir. 2016)).

Ross argues that the only evidence connecting him to the drug deal involving Hill and Monell were his text messages to Hill. Ross argues that these text messages show only innocent conduct and that mere association with Hill is insufficient to establish Ross' involvement in the methamphetamine conspiracy. *See United States v. Caves*, 890 F.2d 87, 94 (8th Cir. 1989) ("[M]ere association with a known or suspected criminal . . . does not create probable cause to arrest." (quoting *United States v. Clark,* 754 F.2d 789, 791 (8th Cir. 1985))). The affidavit establishes that officers knew Hill had traveled from California and was supposed to deliver five pounds of methamphetamine to Monell on

9

November 8, 2017, based on the confidential informant's and Monell's statements. Officers could reasonably infer that at least one additional person was involved beside Hill, since Monell had said "they" were delivering the methamphetamine. Officers could also reasonably infer that this additional person was Ross. A short time after Hill was taken into custody, Ross sent text messages asking where Hill was, asking why Hill was not responding, and saying they were going to hit the road. Although the text messages did not refer to drugs, officers could reasonably infer that Ross was involved in the planned delivery of methamphetamine from Ross' concern about Hill's whereabouts: Ross seemed to be expecting contact from Hill, which was not received because Hill had been arrested, and officers knew Hill (and another person) were supposed to deliver methamphetamine to Monell sometime that day. Then, officers discovered Ross' car, which was registered to an address in California, at a local motel within one mile of Monell's father's residence, where the methamphetamine exchange was to occur. Based on training and experience, officers knew drug dealers often "show up at a buy location without any drugs," because they "want to see the money before showing the drugs to the buyer[,] and they will keep the shipment of methamphetamine close for quick retrieval." Doc. 25-2 at 7. The text messages in combination with this other evidence provided probable cause of Ross' involvement in the drug conspiracy. More than "mere association" with a known drug dealer is involved here: officers could reasonably infer that Ross had traveled from California with Hill to transport methamphetamine (distinguishing Ross from other friends and relatives of Hill's who had not traveled from California to Sioux City and had no involvement in the planned delivery of methamphetamine to Monell). The facts in the affidavit establish a "substantial basis" for concluding probable cause existed that Ross was involved in the drug deal involving Hill and Monell.

Even if the facts in the warrant were insufficient to connect Ross to the delivery of methamphetamine from California, officers knew additional information that was not included in the warrant. When it is later determined that a warrant is not supported by

10

probable cause, evidence obtained from that warrant need not be excluded if officers reasonably relied in good faith on the judge's issuance of the warrant. *United States v. Carpenter*, 341 F.3d 666, 669 (8th Cir. 2003) (discussing the good-faith exception outlined in *United States v. Leon*, 468 U.S. 897 (1984)). Good-faith reliance has been found when evidence was presented to show that officers were aware of additional information that made their reliance on the warrant objectively reasonable. *See Johnson*, 848 F.3d at 879 (noting affiant also knew in search for sex abuse evidence that defendant was a registered sex offender, had previously failed to register as a sex offender, lived with the victim's mother during the time of alleged abuse, and occasionally lived at the residence searched); *United States v. Pruett*, 501 F.3d 976, 981 (8th Cir. 2007) (recounting testimony of affiant at suppression hearing regarding additional information that corroborated information from an informant contained in the affidavit), *vacated on other grounds*, 552 U.S. 1241 (2008), *reinstated in relevant part*, 523 F.3d 863 (8th Cir. 2008); *United States v. Marion*, 238 F.3d 965, 969 (8th Cir. 2001) (discussing affiant's testimony at suppression hearing about additional surveillance at the place to be searched and that cocaine found prior to search warrant was consistent with distribution). In determining the objective reasonableness of an officer's reliance on a warrant, a reviewing court looks at the totality of the circumstances. *Carpenter*, 341 F.3d at 673.

In addition to the information contained in the affidavit, officers knew that in his text messages to Hill, Ross had threatened to hit the road if Hill did not respond, which does not exactly indicate innocent conduct—someone not involved in criminal behavior would likely be concerned if his friend did not respond to text messages and would not want to leave the city they had traveled to together from hundreds of miles away. Officers also knew that in addition to using the word "they," Monell had referred to his methamphetamine sources as "his guys," further supporting officers' belief that more people than Hill were involved. And officers had additional information from the confidential informant, who relayed that shortly after Hill arrived at Monell's father's house, Monell had stated his "California guy" was staying at a hotel waiting for money

11

(adding to the relevance of officers discovering Ross' vehicle at a motel). Finally, the vehicle driven by Hill had been searched earlier in the day, and officers did not recover a "large amount" of methamphetamine, further suggesting that an additional person besides Hill was involved and that he had the methamphetamine. These additional facts further support a finding of probable cause of Ross' involvement in the drug conspiracy and demonstrate the officers' good-faith reliance on the warrant.

Next, I address issues unique to the search of the vehicle and the search of the motel room under the warrant.

### 1. Ross' Vehicle

As set forth in the warrant, application, and affidavit, the vehicle to be searched was registered to Ross. The affidavit suggests that Ross' vehicle was located at the Town and Country Motel, within a mile of Monell's father's residence (where Monell and Hill had met earlier in the day). Further, the affidavit provides that based on her training and experience, Officer Albrecht knew that "drug dealers will use vehicles as safe houses to hide their illegal drugs and to transport illegal drugs from one point to another" and that drug dealers often "want to see the money before showing the drugs to the buyer and they will keep the shipment of methamphetamine close for quick retrieval." Doc. 25-2 at 5, 7. Ross does not seriously dispute that if probable cause exists of his involvement in the methamphetamine conspiracy, the evidence establishes a nexus between his vehicle and evidence of his criminality. *See* Doc. 22-1 at 5-6. Rather, Ross argues that the warrant to search his vehicle was invalid because the warrant and application describe a "Kai" (instead of a Kia) and the supporting affidavit lists the wrong license plate number. *Id.* at 6-9.

Ross relies on *United States v. Thomas*, which recognized that "[t]o satisfy the particularly requirement" of the Fourth Amendment, "the [vehicle] to be searched must be 'described with sufficient particularity as to enable the executing officer to locate and identify the [vehicle] with reasonable effort' and to avoid mistakenly searching the wrong

12

[vehicle]." 263 F.3d 805, 807 (8th Cir. 2001) (quoting *United States v. Gitcho*, 601 F.2d 369, 371 (8th Cir. 1979)). "Mere technical errors in particularity are not enough to invalidate a search warrant." *United States v. Valentine*, 984 F.2d 906, 909 (8th Cir. 1993). "[W]arrants have been upheld 'where one part of the description of the [vehicle] to be searched is inaccurate, but the description has other parts which identify the [vehicle] to be searched with particularity.'" *United States v. Palega*, 556 F.3d 709, 713 (8th Cir. 2009) (quoting *Gitcho*, 601 F.2d at 371). In *Thomas*, although the affidavit in support of the search warrant "included the proper address and a detailed description of the [apartment] to be searched," the warrant itself inadvertently listed the wrong address (correct street, but wrong street number and apartment number) and contained no other identifying information about the apartment. 263 F.3d at 806-07. The court held the warrant invalid, although it recognized "several [Eighth Circuit] cases . . . finding the particularity requirement satisfied although the description on the search warrant in question was not entirely accurate" (and ultimately declined to suppress evidence under the good-faith exception). *Id.* at 807, 809.

Here, the only mistake in the warrant itself was a typographical error describing the make of the vehicle to be searched as a "Kai," as opposed to a Kia. Doc. 22-1 at 1. Unlike in *Thomas*, here, the warrant contained other identifying information for the vehicle, namely, the VIN number, that the vehicle was registered to Ross in California, and that the vehicle was a 2016 "4 door." *Id.* A VIN number is distinct to each vehicle, and it appears from this record that Ross was the registered owner of only one vehicle. As such, "the description of the [vehicle] in the warrant provided enough accuracy to locate the intended [vehicle], regardless of the" typographical error. *Palega*, 556 F.3d at 713. Moreover, when evaluating the particularity of a warrant, the Eighth Circuit has found relevant whether a mistake in the search warrant results in a description of a nonexistent place or item to be searched. *See Gitcho*, 601 F.2d at 371. Here, no model of car in existence is called a "Kai," so "the probability of a mistaken search was negated." *Palega*, 556 F.3d at 714.

13

The affidavit[8] contained a more serious mistake, listing the wrong license plate number for the vehicle. Doc. 25-2 at 6-7. It included other accurate information as well, identifying the vehicle as a "dark blue Kia 4 door with California plates" registered to Ross discovered at the Town and Country Motel. Doc. 25-2 at 6-7. This additional information adequately identified the vehicle to be searched, as officers were aware of only one vehicle registered to Ross (moreover, the VIN number in the warrant provided additional specificity). There was no probability that the incorrect vehicle would be searched, as the incorrect license plate number in the affidavit belonged to a minivan registered to a rental company that officers had discovered at the Holiday Inn, and therefore, it did not match the description of Ross' vehicle contained in the affidavit. The affidavit included sufficient particularity to describe the vehicle to be searched, despite the inclusion of an incorrect license plate number. *See United States v. Thurman*, 625 F.3d 1053, 1057 (8th Cir. 2010) (upholding warrant listing wrong street number for house to be searched when it accurately described the house and its location); *Palega*, 556 F.3d at 713-14 (upholding warrant when it gave an accurate physical description of the residence to be searched and the alias of the owner, but mistakenly listed the owner's brother's name).

Even if the affidavit was insufficiently particular such that the warrant was invalid, the good-faith exception would apply. When evaluating whether officers relied in good faith on a warrant containing inaccurate information affecting particularity, the Eighth Circuit has found relevant that "the agents executing the warrant personally knew which [vehicle] w[as] intended to be searched," that the vehicle was "under constant surveillance while the warrant was obtained," and that the vehicle "which w[a]s intended to be searched w[as], in fact, [the vehicle] actually searched." *Gitcho*, 601 F.2d at 371-72 (upholding search when the warrant listed a nonexistent address for the house to be

---

[8] I assume, without deciding, that a mistake affecting particularity in the affidavit can render the warrant invalid.

searched and no other description); *see Thomas*, 263 F.3d at 809 (upholding search when the warrant listed an incorrect, existing address because the residence to be searched was under surveillance while the warrant was obtained, and the officer executing the warrant had personal knowledge of the residence to be searched); *Lyons v. Robinson*, 783 F.2d 737, 738 (8th Cir. 1985) (per curiam) (upholding search when a house sat on an intersection of two streets and officers mistakenly listed the wrong intersecting street in the house's address, because the warrant provided an accurate physical description of the premises and officers executing the warrant knew which house was supposed to be searched); *see also United States v. Gamboa*, 439 F.3d 796, 806-07 (8th Cir. 2006); *United States v. McCain*, 677 F.2d 657, 660-61 (8th Cir. 1982). Here, officers kept Ross' vehicle under surveillance from the time it was discovered in the Town and County Motel parking lot until the execution of the search warrant. Officers executing the search warrant had personal knowledge that Ross' vehicle was intended to be searched, and his vehicle (and no other) was searched. Any deficiency in particularity, therefore, does not require suppression under the good-faith exception. *See United States v. Clement*, 747 F.2d 460, 461 (8th Cir. 1984) (upholding search when the warrant authorized the search of an apartment belonging to defendant but listed the wrong apartment number, because there was no probability of mistake since officers "personally knew which premises were intended to be searched" and belonged to the defendant).

### 2. Room 33

As an initial matter, the Government argues that Ross did not have a reasonable expectation of privacy in room 33 such that he can challenge the search of the room. The "[a]bility 'to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection . . . has a legitimate expectation of privacy in the invaded place.'" *United States v. Williams*, 521 F.3d 902, 905 (8th Cir. 2008) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). This requires the defendant "show (1) a subjective expectation of privacy, and (2) the expectation is objectively reasonable." *Id.*

15

at 905-06 (citing *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)). "The expectation of privacy associated with a person's home applies with equal force to a properly rented motel room during the rental period." *United States v. Carter*, 854 F.2d 1102, 1105 (8th Cir. 1988). "[I]ndividuals have a reasonable expectation of privacy in their hotel room," but "'[m]ere visitors' to someone else's hotel room do not have a reasonable expectation of privacy" in the room. *Williams*, 521 F.3d at 906. Factors to consider when determining whether a defendant was staying in a hotel room or merely visiting include whether the defendant checked in or paid for the room; whether the defendant had a key to the room; whether officers discovered the defendant in the room alone or with others; the length of time the defendant was present in the room; whether the defendant's personal belongings were in the room; and whether the defendant had the ability to exclude others' use of the room. *See id.* at 906; *Carter*, 854 F.2d at 1105.

The Government argues that Ross cannot prove a reasonable expectation of privacy in room 33 because Watts registered for the room, not Ross.[9] But as the Government recognizes, "that [a defendant] did not register or pay for the hotel room does not necessarily preclude him from having a reasonable expectation of privacy in the room." *Williams*, 521 F.3d at 905 (citing *United States v. Jeffers*, 342 U.S. 48, 50-52 (1951)). "[A]n overnight guest . . . present in the motel room of another" has a reasonable expectation of privacy in the room. *United States v. Walton*, 188 F. App'x 531, 534 (8th Cir. 2006) (per curiam); *see also United States v. Junkman*, No. CR96-4033, 1997 WL 33559171, at *2 (N.D. Iowa June 24, 1997) (report and recommendation); *United States v. Connor*, 948 F. Supp. 821, 830 (N.D. Iowa 1996), *aff'd*, 127 F.3d 663 (8th Cir. 1997). As the affidavit in support of the search warrant sets forth, Watts "listed [Ross']

---

[9] I note that the Supreme Court heard oral argument on January 9, 2018, in a case presenting the question whether "a driver ha[s] a reasonable expectation of privacy in a rental car when he has the renter's permission to drive the car but is not listed as an authorized driver on the rental agreement." Petition for Writ of Certiorari at i, *Byrd v. United States* (U.S. May 11, 2017) (No. 16-1371), *cert. granted*, 138 S. Ct. 54 (Sept. 28, 2017).

vehicle [o]n the hotel" registration card. Doc. 25-2 at 6-7. Ross also sent text messages to Hill directing him to find "us" another hotel. And when officers first entered room 33, Ross was lying on one of the two beds. This evidence supports that Ross was staying in the motel room with Watts, as opposed to merely visiting Watts in her motel room (and distinguishes *United States v. Sturgis*, 238 F.3d 956, 958-59 (8th Cir. 2001), the case relied upon by the Government, in which the defendant explicitly told agents "he was merely visiting [his friend] at the motel").

On the other hand, it is somewhat unclear if Watts, Ross, and Poellnitz intended to stay the night in the motel room. Ross sent text messages to Hill threatening to leave Sioux City, although hours after those text messages were sent, Ross was still in the motel room, so the messages were perhaps empty threats. And, officers did not discover any of Ross' luggage in the motel room. That Ross had not yet slept in the motel room would not preclude a finding of a reasonable expectation of privacy in the room. *See United States v. Roby*, 122 F.3d 1120, 1122, 1125 (8th Cir. 1997) (stating in dicta that a defendant registered to a hotel room who had been present in the room for twenty minutes and not yet slept in the room had a reasonable expectation of privacy in the room). But whether Ross planned to sleep in the room could affect the reasonableness of his expectation of privacy in the room.

As the Government argues, visitors to a motel room present only for purposes of short-term commercial drug trafficking do not have a reasonable expectation of privacy in the room. *See United States v. Corona-Chavez*, 328 F.3d 974, 980 & n.6 (8th Cir. 2003); *Sturgis*, 238 F.3d at 958-59. Here, the evidence supports that the planned drug exchange was to occur at Monell's father's house, not the motel. Ross was present in the motel room for purposes of commercial drug trafficking in that he was only in Sioux City to deliver methamphetamine to Monell, but Ross was not selling drugs in the motel room itself, *cf. Stugis*, 238 F.3d at 958-59, and no exchange of money occurred in the motel room as part of the drug conspiracy, *cf. Corona-Chavez*, 328 F.3d at 976-77, 980 & n.6. *Sturgis* and *Corona-Chavez* are thus distinguishable. Additionally, in those cases,

17

the defendant was merely visiting the hotel room. *Corona-Chavez*, 328 F.3d at 980; *Sturgis*, 238 F.3d at 958-59. As discussed above, here, the record supports that Ross was staying in the motel room with Watts. The facts here fall somewhere in between the Eighth Circuit cases (cited throughout) that address whether a defendant had a reasonable expectation of privacy in a motel room. Ultimately, I find Ross had an expectation of privacy in the motel room that was objectively reasonable. He can therefore challenge the search of the motel room under the Fourth Amendment.

The affidavit contains information that links Ross to the Town and Country Motel: his car was discovered in the motel parking lot, and the motel was located within a mile of "the meet location" between Monell and Hill (Monell's father's house), which officers found significant because drug dealers often "want to see the money before showing the drugs to the buyer[,] and they will keep the shipment of methamphetamine close for quick retrieval." Doc. 25-2 at 7. The only information in the affidavit that links Ross to room 33, however, is that the room was registered to someone from California (albeit a different city in California than Ross) and that the reservation for the room "listed Ross' vehicle." Doc. 25-2 at 6-7. The affidavit did not clarify that the registration card listed a Kia with California plates, like Ross' vehicle, but one with a different license plate number. Doc. 25-1; Doc. 25-2 at 6-7.

In challenging the sufficiency of the affidavit with regard to the motel room, Ross relies on the argument, rejected above, that no evidence connected him to criminal conduct; he does not argue that the affidavit failed to establish a nexus between himself (and criminal activity) and the motel room. Doc. 22-1 at 3-5; Doc. 30 at 4-6. Neither does Ross attack the veracity of the statement in the affidavit that "owners indicated that room 33 . . . listed [Ross'] vehicle on the hotel reservation," Doc. 25-2 at 7, nor argue that officers should have included in the affidavit that the vehicle listed on the hotel registration card had a different license plate number than Ross' vehicle. Although there is evidence in the record that the statement in the affidavit about the hotel reservation could be considered misleading, there is no evidence (or allegation or argument) that it

18

was a deliberate falsehood or made with reckless disregard for the truth, which is required for a court to disregard a misleading or inaccurate statement contained in an affidavit when determining whether the affidavit establishes probable cause.  *See Franks v. Delaware*, 438 U.S. 154, 156-57, 171-72 (1978).

When an affidavit contains a false or misleading statement due to an officer's negligence, the *Leon* good-faith exception applies, and a "court looks to the totality of the circumstances in assessing the objective reasonableness of an officer's execution of a warrant, 'including any information known to the officer but not presented to the issuing judge.'"  *United States v. Conant*, 799 F.3d 1195, 1202 (8th Cir. 2015) (quoting *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015)); *see also United States v. Clapp*, 46 F.3d 795, 800 (8th Cir. 1995) (holding that a search warrant was not invalid despite containing "inaccurate" statements made negligently or carelessly and holding that "[e]ven assuming" the statements "were made with reckless disregard for the truth and . . . deleted, the remaining facts" in the affidavit support probable cause).  Here, in addition to the information from the registration card (mentioned in the affidavit), officers knew that Ross' car was parked directly in front of the door to room 33, and there were no other vehicles nearby.  They also knew that Ross had sent text messages to Hill earlier in the day directing him to find "us" another hotel and stating "we" are leaving if Hill did not respond, so officers could reasonably infer that Ross was not staying in a hotel room alone (making it more likely that Ross was staying in the room registered to a woman from California).  An officer conducting surveillance saw a person who he believed to be Ross emerge from the area near Ross' car (and consequently, from near the door to room 33).  Officers also knew from Ross' text messages that he was staying at a hotel, and they could reasonably infer that he was staying at the Town and Country Motel, since that is where his car was found.  Finally, officers knew that the methamphetamine they believed Ross and Hill to have transported from California had not been found in Hill's car, making it more likely to be located in Ross' vehicle or hotel

room.  Based on the totality of the circumstances, I recommend finding that officers relied in good faith on the search warrant for the motel room.[10]

## B.  Search of the Vehicle Under the Automobile Exception

The Government argues that even if the warrant to search the vehicle is invalid and the *Leon* good-faith exception inapplicable, the search of the vehicle was authorized under the automobile exception to the warrant requirement.  Doc. 25 at 12-14.  The automobile exception can be applied "even when law enforcement obtains a search warrant later determined to be invalid."  *United States v. Holleman*, 743 F.3d 1152, 1158-59 (8th Cir. 2014) (citing *United States v. Martinez*, 78 F.3d 399, 401 (8th Cir. 1996)).  Under the automobile exception, when officers have probable cause to search a vehicle, "[a] warrant is not required . . . if [the vehicle] 'is being used on the highways, or if it is readily capable of such use and is found stationary in a place not regularly used for residential purposes.'"  *United States v. Long*, 900 F.2d 1270, 1277 (8th Cir. 1990) (quoting *California v. Carney*, 471 U.S. 386, 392 (1985)).

Here, Ross' vehicle was readily capable of being used on the highways, as Ross had apparently driven from Omaha to Sioux City the morning of the search.  His vehicle was located in a motel parking lot, which the Eighth Circuit has recognized is not "considered 'residential' for purposes of the automobile exception" under caselaw issued prior to the Supreme Court's decision in *Florida v. Jardines*, 569 U.S. 1 (2013).  *Holleman*, 743 F.3d at 1158-59.  The Eighth Circuit in *Holleman* relied on *United States v. Washburn*, 383 F.3d 638, 641-42 (7th Cir. 2004), and *United States v. Foxworth*, 8 F.3d 540, 545 (7th Cir. 1993), which held that the automobile exception applies to searches of cars parked in motel parking lots because such lots are "readily accessible to

---

[10] It is not entirely clear whether any incriminating evidence was seized during the search of the motel room or whether Ross merely seeks the suppression of the statements he made as "fruits" of the unlawful search, but if the latter, I note that I recommend suppressing Ross' statements for a different reason.

the public and not generally thought of as a place normally used as a residence." *See also United States v. Ervin*, 907 F.2d 1534, 1538-39 (5th Cir. 1990) (holding that the automobile exception applied to search of trailer that "was not parked in a place regularly used for residential purposes but in a motel parking lot"). The court in *Holleman* also relied on *United States v. Diaz*, 25 F.3d 392, 396-97 (6th Cir. 1994), and *United States v. Ludwig*, 10 F.3d 1523, 1526-27 (10th Cir. 1993), which addressed whether a defendant had a reasonable expectation of privacy in a hotel parking lot such that a drug dog sniff of a vehicle parked in the lot was a "search" within the meaning of the Fourth Amendment.[11] The Eighth Circuit in *Holleman* did not address whether these cases are still good law, leaving open the issue "whether *Jardines* casts doubt on those cases which hold a hotel parking lot is a place not regularly used for residential purposes" under the automobile exception. *Holleman*, 743 F.3d at 1159.

In *Jardines*, the Supreme Court held that the "curtilage" of the home includes the front porch and that "physically intruding" on the curtilage to conduct a dog sniff "is a 'search' within the meaning of the Fourth Amendment." 569 U.S. at 3, 7, 11-12. The Court in *Jardines* relied on a trespass theory to determine that a search had occurred, reasoning that "[a]n implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave," and that conducting a drug detection dog sniff exceeds the scope of that license. 569 U.S. at 8-9. As the Eighth Circuit has recognized, the Court in *Jardines* "did not reach the expectation of privacy test." *United States v. Hopkins*, 824 F.3d 726, 732 (8th Cir. 2016). I thus do not believe that *Jardines* affects the holdings in *Diaz* and *Ludwig*, which employed the expectation of privacy test. Bolstering this conclusion, the Eighth Circuit has reaffirmed in post-*Jardines* cases that "there is no 'generalized expectation of privacy in the common areas of an apartment building.'" *Id.*

---

[11] The Eighth Circuit did not cite to the portion of *Ludwig* that discussed the automobile exception (10 F.3d at 1529).

at 732 (quoting *United States v. McCaster*, 193 F.3d 930, 933 (8th Cir. 1999)); *see also Azam v. City of Columbia Heights*, 865 F.3d 980, 990 (8th Cir. 2017). Likewise, there could be no expectation of privacy in the Town and County Motel parking lot, which was used by all the guests and employees of the motel. Neither would the *Jardines* trespassory theory apply, as the parking lot was "a common space[] used by a number of" guests that guests did not have "exclusive control over." *United States v. Sweeney*, 821 F.3d 893, 900-03 (7th Cir. 2016) (holding that basement in shared apartment building was not curtilage and that search of basement did not violate defendant's property rights nor a reasonable expectation of privacy). I do not believe that *Jardines* "casts doubt" on the applicability of the automobile exception to vehicles parked in a motel parking lot. *See also United States v. Beene*, 818 F.3d 157, 164 (5th Cir. 2016) (suggesting that *Mack v. City of Abilene*, 461 F.3d 547, 550, 552 (5th Cir. 2006), which "appl[ied] the [automobile] exception to the search of a vehicle . . . located in the defendant's apartment complex parking lot" was still good law).

I have already found that probable cause existed to search Ross' vehicle under the warrant. In addition, before searching the vehicle, Officer Yaneff performed a drug dog sniff of the vehicle with his K-9 Cash, who alerted to the presence of narcotics. A positive alert by a reliable narcotics dog may establish probable cause to search a vehicle. *United States v. Jackson*, 811 F.3d 1049, 1053 (8th Cir. 2016). "'[A] court can presume (subject to any conflicting evidence offered) that [a] dog's alert provides probable cause to search' if 'a bona fide organization has certified a dog after testing his reliability in a controlled setting . . . [or] if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs.'" *United States v. Gonzalez*, 781 F.3d 422, 429 (8th Cir. 2015) (quoting *Florida v. Harris*, 568 U.S. 237, 246-47 (2013)). Officer Yaneff testified that his K-9 Cash was certified for drug detection every year and that he had last been certified in September 2017 by Dogs for Law Enforcement. Officer Yaneff also testified that he attends weekly, four-hour training sessions with his K-9. Ross does not challenge Cash's certification or abilities. I therefore find that Cash's

22

positive alert for drugs on Ross' vehicle provided probable cause to search the vehicle, independent of the other evidence. If the district court finds that the search of Ross' vehicle cannot be upheld under the search warrant or the good-faith exception, I recommend finding that officers could conduct a warrantless search of Ross' vehicle under the automobile exception.

### C. Failure to Read Ross His Rights Under <u>Miranda</u>

Under *Miranda*, 384 U.S. at 479, a suspect subject to custodial interrogation must first be advised of certain rights, and he must waive these rights before the interrogation can proceed. Here, it is undisputed that Ross was in custody during the execution of the search warrant and that no officer read him his *Miranda* rights prior to Officer Davis' questioning. At issue is whether Officer Davis' questioning amounted to an interrogation.

"Interrogation in the [*Miranda*] context refers to express questioning and to words or conduct that officers should know is 'reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). As a general rule, "a mere factual statement . . . serv[ing] to inform the suspect as to the status of his case or the investigation into his activities" does not constitute interrogation. *United States v. Hull*, 419 F.3d 762, 767 (8th Cir. 2005). Neither does asking "for routine information necessary for basic identification purposes," unless "the government agent should reasonably be aware that the information sought . . . is directly relevant to the substantive offense charged." *United States v. Cowan*, 674 F.3d 947, 958 (8th Cir. 2012) (quoting *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996)). Spontaneous, volunteered statements are not the product of interrogation, and "[a]n officer's request for clarification of a spontaneous statement generally does not constitute interrogation," unless the follow-up question "attempted to enhance [the defendant's] guilt." *United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005) (quoting *Butzin v. Wood*, 886 F.2d 1016, 1018 (8th Cir. 1989)). "The government bears the burden of proving by a preponderance of the

23

evidence that a defendant's statements were not the product of a custodial interrogation." *United States v. Koons*, No. CR00-3041-MWB, 2001 WL 34008498, at \*8 n.1 (N.D. Iowa Apr. 26, 2001) (citing *Miranda*, 384 U.S. at 475); *see also Holman v. Kemna*, 212 F.3d 413, 418-19 (8th Cir. 2000) ("constru[ing] the ambiguity in the record in favor of [the defendant to] . . . conclude that [the defendant] was subject to interrogation); *United States v. Sepulveda-Sandoval*, 729 F. Supp. 2d 1078, 1097-98 (D.S.D. 2010) (adopting report and recommendation) (noting that district courts are split regarding the burden of proof and that the Eighth Circuit has not addressed the issue).

Officer Davis asked Ross questions during the execution of a search warrant. That search warrant was based on probable cause that Ross had driven from California to Sioux City (going through Omaha) for the purpose of delivering pound quantities of methamphetamine. When Officer Davis asked Ross questions about this travel (where he was from, where he was going, what he had been doing during the trip), he should have known that it was "reasonably likely to elicit an incriminating response." By that same token, although I credit Officer Davis' testimony that he was unaware that Ross' "KC" tattoo could have gang meaning, by asking whether Ross' tattoo stood for "Kansas City," Officer Davis could have elicited further information about Ross' travels, such as the route taken and whether he had driven from or through Kansas City. Although, as the Government argues, "[p]olite conversation is not the functional equivalent of interrogation," *United States v. Tail*, 459 F.3d 854, 858 (8th Cir. 2006), here, Officer Davis' questions about Ross' travels went beyond polite conversation given that he suspected Ross of traveling in furtherance of a drug conspiracy.

The facts here are similar to *United States v. Longbehn*, 850 F.2d 450 (8th Cir. 1988), and *Cowan*, 674 F.3d 947. In *Longbehn*, the court found that the defendant was "overtly interrogated" when officers asked him questions during the execution of a search warrant. 850 F.2d at 452. In that case, officers believed the defendant, a police officer, had been providing confidential police information to his uncle, the leader of a methamphetamine conspiracy. *Id.* at 451. Officers subjected the defendant to

24

interrogation by asking him about his relationship with his uncle, if he knew how his uncle made money, if he had provided police information to his uncle, and about the evidence seized. *Id.* Like here, although these questions could seem like "polite conversation" in a different context, because officers were investigating the defendant's connection to his uncle's drug conspiracy, they amounted to interrogation.

In *Cowan*, officers had probable cause that crack cocaine was being transported from Chicago and sold out of a particular apartment in Davenport, Iowa. 674 F.3d at 951. When they executed the search warrant, they detained the eight adults and two children found in the apartment, including the defendant. *Id.* Officers asked for the defendant's identification, and he responded that it was in his wallet. *Id.* Officers next asked how the defendant had gotten into the apartment, to which he responded that he had traveled by bus from Chicago. *Id.* During a pat-down search of the defendant, officers discovered keys to a vehicle and asked why he had keys if he had traveled by bus from Chicago. *Id.* The court held that the first two requests did not amount to an interrogation because they were seeking information for basic identification purposes— officers were "trying to understand and identify the defendant's presence in the apartment." *Id.* at 958. The last question, however, crossed the line into interrogation, because the officer "'should reasonably [have been] aware that the information sought . . . [wa]s directly relevant to the substantive offense,'" because the officer "had information linking both the crack cocaine and [the defendant] to Chicago" and "may well have suspected [the defendant] of transporting the crack cocaine." *Id.* (first alteration in original) (quoting *Brown*, 101 F.3d at 1274). Here, unlike in *Cowan*, Officer Davis was aware of Ross' identity and purpose in the motel room before executing the search warrant, so questions about his travel were not necessary for "basic identification purposes." Prior to any questioning, Officer Davis had information about Ross similar to the officer in *Cowan* before asking his last question: in both cases, the officers asked about the defendants' travels, despite having information that the defendants' travels were for the purpose of transporting illegal drugs.

I recommend finding that Officer Davis' questioning of Ross during the execution of the search warrant amounted to an interrogation. Because no officer had given Ross his *Miranda* warnings prior to this questioning, his statements should be suppressed as evidence in the prosecution's case-in-chief. *See Harris v. New York*, 401 U.S. 222, 226 (1971) (holding that statements taken in violation of *Miranda* may be used to impeach a defendant's conflicting testimony at trial).

## IV.    CONCLUSION

I RESPECTFULLY RECOMMEND that Defendant's amended motion to suppress (Doc. 29) be **granted in part and denied in part**. I recommend suppressing the statements Ross made during the execution of the search warrant from the prosecution's case-in-chief, but not evidence seized during the search of Ross' motel room and vehicle.

Ross, along with codefendant Hill, wishes to proceed to trial as scheduled during the May trial setting, and no parties seeks a continuance of that trial date, despite this pending motion to suppress. Doc. 38. As a result, trial in this case is scheduled to begin on May 7, 2018. Doc. 39. As previously mentioned, the court notes that at the end of the suppression hearing held on March 13, 2018, counsel for Ross and the Government requested a continuance for arguments on the motion to suppress so they could obtain a transcript from the suppression hearing. Doc. 31. The court granted this request and arguments were made on March 26, 2018 (neither attorney cited the transcript (Doc. 32) during their arguments on the motion). Doc. 35. In light of this context, the court will order a shortened period for objecting to and responding to objections to this Report and Recommendation.

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within **seven days** of the service of a copy of this Report and Recommendation; any response to the objections must be filed within **three days** after

26

service of the objections. A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule on the objections. LCrR 59. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DATED** this 11th day of April, 2018.

Kelly K.E. Mahoney
United States Magistrate Judge
Northern District of Iowa